Melissa A. Fortunato (# 319767)
**BRAGAR EAGEL & SQUIRE, P.C.**
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 365-7149
Email: fortunato@bespc.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAIL BECKER, derivatively on behalf of NEKTAR THERAPEUTICS,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD W. ROBIN, GIL M. LABRUCHERIE, JEFF AJER, ROBERT B. CHESS, R. SCOTT GREER, LUTZ LINGNAU, ROY A. WHITFIELD, and KARIN EASTHAM,<br><br>Defendants,<br><br>and<br><br>NEKTAR THERAPEUTICS,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Gail Becker ("Plaintiff"), by and through her counsel, derivatively on behalf of nominal defendant Nektar Therapeutics ("Nektar" or the "Company"), submits this Verified Stockholder Derivative Complaint ("Complaint") against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by Nektar to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Nektar; (iii) a securities class action lawsuit filed in the United States District Court for the Northern District of California captioned *Damiba v. Nektar Therapeutics*, No. 3:19-cv-5173-JSW (N.D. Cal.) (the "Securities Class Action"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning Nektar.

## **SUMMARY OF THE ACTION**

1. This is a stockholder derivative action asserting claims for breach of fiduciary duty, violations of Section 14(a) of the Securities Exchange Act (the "Exchange Act"), and misappropriation of information brought on behalf of nominal defendant Nektar against the Individual Defendants. Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from February 15, 2019 to August 8, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Nektar and other damages, including damages to its reputation and goodwill.

2. Nektar is a biopharmaceutical company that specializes in the research, discovery, and development of novel medications for areas in which there is sizeable unmet medical need. Nektar's pipeline includes new investigational drugs for treatment and use in a variety of medical areas including cancer, chronic pain, and autoimmune disease. In its public filings, Nektar purports to leverage its proprietary chemistry platform to develop new drug candidates which utilize the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company's advanced polymer conjugate technology platforms, designed to allow the "development of new molecular entities that target known mechanisms of action."

3. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg. It is a biologic substance designed to stimulate proliferation and growth of tumor-killing immune cells. In the PIVOT-02 clinical study, the Company evaluated the benefit, safety, and tolerability of combining NKTR-214 with Opdivo, an antibody, in collaboration with Bristol-Myers Squibb Company ("Bristol-Myers").

4. On August 8, 2019, the Individual Defendants revealed that a manufacturing issue caused two batches of NKTR-214 to differ from the other 20 batches that were produced. Moreover, these batches resulted in variable clinical benefit from other batches used in the Company's PIVOT-02 clinical trial. On this news, the price of Nektar stock nosedived 30%, or $8.65, to close at $20.92 per share the next day on an unusually heavy trading volume.

5. Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants committed securities fraud by failing to disclose that: (1) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. Finally, on April 30, 2019, certain of the Individual Defendants negligently issued a materially false and misleading proxy statement urging stockholders to reelect certain directors under false pretenses.

3
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

7.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Nektar has sustained damages as described below.

**JURISDICTION**

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

9.      Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

10.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant Nektar is headquartered in this District.  In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

13.      Plaintiff is currently a Nektar stockholder and has continuously been a stockholder of the Company since at least April 2018.

14.      Nominal defendant Nektar is incorporated under the laws of the State of Delaware and maintains its headquarters at 455 Mission Bay Boulevard South, San Francisco, California 94158.  The Company's shares are publicly traded on the NASDAQ under the symbol "NKTR."

15.      Defendant Howard W. Robin ("Robin") has served as the Company's President and Chief Executive Officer ("CEO") since January 2007.  Defendant Robin also has served as a director of the Board since February 2007.  According to filings with the SEC, defendant Robin received $13,330,667 in compensation from the Company in 2018.  Defendant Robin is named as a defendant in the Securities Class Action.  Defendant Robin sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal

4

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 19, 2019 | 108,882 | $42.19 | $4,594,176 |
| May 16, 2019 | 13,383 | $31.37 | $419,825 |
| May 21, 2019 | 100,000 | $33.00 | $3,300,000 |
| July 23, 2019 | 100,000 | $31.29 | $3,128,667 |

16. Defendant Gil M. Labrucherie ("Labrucherie") has served as Nektar's Senior Vice President and Chief Financial Officer since June 2016. According to the Company's public filings with the SEC, defendant Labrucherie received $5,733,928 in compensation from the Company in 2018. Defendant Labrucherie is named as a defendant in the Securities Class Action. Defendant Labrucherie sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 19, 2019 | 3,592 | $42.39 | $152,265 |
| May 16, 2019 | 3,767 | $31.37 | $118,171 |
| June 17, 2019 | 25,000 | $33.71 | $842,750 |
| July 10, 2019 | 25,000 | $34.57 | $864,250 |

17. Defendant Jeff Ajer ("Ajer") has served as a director of the Board since September 2017. Defendant Ajer was a member of the Company's Audit Committee during the Relevant Period. According to the Company's filings with the SEC, defendant Ajer received $709,051 in compensation from the Company in 2018.

18. Defendant Robert B. Chess ("Chess") has served as a director of the Board since May 1992. Defendant Chess has also served as Chairman of the Board. Defendant Chess additionally served the Company in a variety of positions over the years. He served as acting President and CEO from March 2006 to January 2007, and as Executive Chairman from April 1999 to January 2007. Defendant Chess also served as Co-CEO from August 1998 to April 2000, as President from December 1991 to August 1998, and as CEO from May 1992 to August 1998. According to the

5

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company's public filings with the SEC, defendant Chess received $741,551 in compensation from the Company in 2018.

19.     Defendant R. Scott Greer ("Greer") has served as a director of the Board since February 2010.  Defendant Greer also served as Chair of the Company's Audit Committee during the Relevant Period.  According to the Company's public filings with the SEC, defendant Greer received $732,551 in compensation from the Company in 2018.

20.     Defendant Lutz Lingnau ("Lingnau") has served as a director of the Board since August 2007.  According to the Company's filings with the SEC, defendant Lingnau received $715,301 in compensation from the Company in 2018.  Defendant Lingnau sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| July 8, 2019 | 10,000 | $34.63 | $346,300 |

21.     Defendant Roy A. Whitfield ("Whitfield") has served as a director of the Board since August 2000.  Defendant Whitfield was a member of the Company's Audit Committee during the Relevant Period.  According to the Company's public filings during the Relevant Period, defendant Whitfield received $708,301 in compensation from the Company in 2018.

22.     Defendant Karin Eastham ("Eastham") has served as a director of the Board since September 2018.  Defendant Eastham was a member of the Company's Audit Committee during the Relevant Period.  According to the Company's public filings with the SEC, defendant Eastham received $1,143,749 in compensation from the Company in 2018.

23.     Defendants Greer, Ajer, Eastham, and Whitfield are sometimes referred to herein as the "Audit Committee Defendants."

24.     Defendants Robin, Labrucherie, and Lingnau are sometimes referred to herein as the "Insider Selling Defendants."

6

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

25.     Defendants Robin, Ajer, Chess, Greer, Lingnau, Whitfield, and Eastham are sometimes referred to herein as the "Director Defendants."

26.     Defendants Robin, Labrucherie, Ajer, Chess, Greer, Lingnau, Whitfield, and Eastham are sometimes referred to herein collectively as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.     By reason of their positions as officers, directors, and/or fiduciaries of Nektar and because of their ability to control the business and corporate affairs of Nektar, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of loyalty, good faith, candor, and due care and are required to use their utmost ability to control and manage Nektar in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of Nektar and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Nektar and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nektar, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Nektar were required to, *inter alia*:

A.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, complying with all FAA rules and regulations, and disseminating truthful and accurate statements to the SEC and the investing public;

B.     Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

7

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

C. Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D. Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E. Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

30. Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith, and a reckless disregard for their duties to the Company and its stockholders. The Individual Defendants were, or should have been, aware that their conduct posed a risk of serious injury to the Company.

31. As the Company's Corporate Governance Policy Statement states:

The Board's responsibilities include the following:

- Understand and approve Nektar's long-term strategies;

- Identify and address the primary issues confronting Nektar with respect to such strategies;

- Identify and address the most important risks facing Nektar;

- Identify, review and evaluate candidates to serve as Chief Executive Officer;

- Review and evaluate the performance of the Chief Executive Officer;

- Review Chief Executive Officer succession plan on an annual basis;

8

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Oversee management to ensure that it acts in the best interest of the corporation and its stockholders;

- Approve acquisitions, divestitures and other major corporate actions;

- Approve Nektar's annual operating financial plan, including significant capital expenditures; and

- Ensure processes are in place for maintaining the integrity of Nektar's financial statements and complying with applicable laws and a publicly available Code of Conduct.

32. The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Nektar and its subsidiaries.

33. According to the Code, the employees and directors of Nektar are responsible for helping Nektar maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Nektar does business.

34. Pursuant to the Code:

The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained. Financial and other activities are to be recorded in compliance with all applicable laws and accounting practices.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission ("SEC"). These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. In connection with these obligations:

- no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

9

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

35. Similarly, Nektar's Audit Committee Charter sets forth the primary duties of the Board's Audit Committee. According to the Audit Committee Charter, the purpose of the Audit Committee was as follows:

The primary responsibility of the Committee is to oversee the Company's financial reporting process (including direct oversight of the auditors) on behalf of the Board and report these activities to the Board. Management is responsible for preparing the Company's financial statements, and the independent auditors are responsible for auditing those financial statements.

*        *        *

The Committee shall:

1. Evaluate the performance of the independent auditors, assess their qualifications, determine whether to retain or to terminate the existing auditors or to appoint and engage new independent auditors for the ensuing year. The Committee shall have the sole and exclusive authority with respect to such matters and the oversight of the independent auditors as a whole, and the independent auditors shall report directly to the Committee.

2. Review and determine the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation. Negotiate and execute, on behalf of the Company, any engagement letters with the Company's independent auditors with respect to such engagement, which actions may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

3. Establish guidelines and procedures with respect to the rotation of the lead (or coordinating) audit partners (having primary responsibility for the audit) and the audit partner responsible for reviewing the audit in accordance with applicable law and SEC and Nasdaq regulations (including regulations with respect to the independence of the independent auditors) and confirm that the independent auditors are in compliance with such policies.

4. Review and approve the retention of the independent auditors for any permissible non-audit services in accordance with applicable law and SEC and Nasdaq regulations and the fees or other compensation for such services (such approval may be delegated to one or more Committee members, provided that all approvals of permissible non-audit services pursuant to this delegated authority be presented to the full Committee at its next meeting).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

5.    At least annually, obtain and review a formal written statement prepared by the independent auditor delineating all relationships between the independent auditor and the Company, consistent with Rule 3526 of the Public Company Accounting Oversight Board, discuss with the independent auditors and review the auditors' independence from management and the Company, including the provision of non-audit services, past employment by the independent auditors of current or prospective Company personnel, the matters included in the written disclosures required by the Independence Standards Board and other relationships or services that could affect the objectivity of the independent auditors, and assess and otherwise take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditors.

6.    Review with the independent auditors any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent auditors and management's response, if any, to such letter, any communications between the audit team and the independent auditor's national office regarding auditing or accounting issues presented by the engagement, as well as additional material written communications between the independent auditors and management.

7.    Review with management and the independent auditors the scope, adequacy and effectiveness of the Company's financial reporting controls, including analysis reports prepared by management and the independent auditors of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any special audit steps taken in the event of material control deficiencies, and an analysis of the effect of alternative GAAP methods on the Company's financial statements.

8.    Review and discuss with management, the Company's Risk Management Committee, the Company's internal auditor and the independent auditors, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks.    Provide oversight to the Company's Risk Management Committee regarding such risks, which may include the areas of finance, information technology, internal audit, or law or other risks as the Committee or the Board deems appropriate.

9.    Establish (at such time as legally required) and maintain procedures for the receipt, retention and treatment of complaints received by the Company (whether initiated by employees of the Company or third parties) with respect to accounting, internal accounting controls or auditing matters, which shall include procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

10.    Undertake the responsibility to investigate and resolve any disagreements between the Company's management and the independent auditors regarding the Company's financial reporting, accounting practices or accounting policies.    Review with the independent auditor any other problems or difficulties the independent auditor may have encountered during the course of the audit work, including any restrictions on the scope of audit activities or access to required information and any significant changes in the planned scope of the audit.

11

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

11. Meet at least once during each fiscal quarter and as deemed necessary by the Committee. In addition, meet not less than twice annually with senior management and the independent auditors in separate executive sessions. In connection with separate executive sessions held with the independent auditors, discuss matters relevant to the quality and integrity of the Company's financial reporting, the results of the independent auditors' examinations, inquire as to the independent auditors' evaluation of the Company's financial and accounting policies and controls and discuss any other matter that the Committee, the independent auditors or management feel should be discussed in private.

12. Discuss with management and the independent auditors the results of the independent auditors' review of the Company's quarterly financial statements, prior to public disclosure or prior to the filing of the Company's Quarterly Report on Form 10-Q with the SEC. Such review shall include all matters required by applicable laws, rules and regulations to be discussed with the independent auditors prior to the filing of such report as well as such matters required to be communicated to the Committee by the independent auditors under Statement on Auditing Standards No. 114.

13. Discuss with management and the independent auditors the financial statements to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K). Discuss with management and the independent auditors the results of the annual audit, including the auditors' judgment about the quality, not just acceptability, of accounting principles, any changes in accounting procedures, the reasonableness of significant judgments and estimates (including material changes in estimates), the clarity of the disclosures in the financial statements and any audit adjustments noted or proposed by the auditors (whether "passed" or implemented in the financial statements). Such review shall include all matters required by applicable laws, rules and regulations to be discussed with the independent auditors prior to the filing of such report as well as such matters required to be communicated to the Committee by the independent auditors under Statement on Auditing Standards No. 114. Recommend to the Board whether, based on the discussion with management and the independent auditors, the financial statements should be included in the Company's Annual Report on Form 10-K.

14. Review and discuss with management and the independent auditors as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

15. Review and discuss with management and the independent auditors any material financial arrangements of the Company which do not appear on the financial statements of the Company and any transactions or courses of dealing with parties related to the Company which transactions are significant in size (as required by applicable Nasdaq rules) or involve terms or other aspects that differ from those that would likely be negotiated with independent parties, and which arrangements or transactions are relevant to an understanding of the Company's financial statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

16.    Review with management and the independent auditors significant issues that arise regarding accounting principles and financial statement presentation, including the adoption of new, or material changes to, existing critical accounting policies or to the application of those policies, the potential effect of alternative accounting policies available under GAAP, the potential impact of regulatory and accounting initiatives and other matters required by applicable laws, rules and regulations to be communicated by the independent auditors to the Committee or which represent significant reporting issues or judgments.

17.    Discuss with management and the independent auditors any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

18.    Review the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

19.    Submit the minutes of all meetings of the Committee to, or discuss the matters discussed at each Committee meeting with, the Board.

20.    Investigate any matter brought to the Committee's attention within the scope of the Committee's duties.

21.    Prepare a report for inclusion in the Company's annual report or proxy statement that describes the Committee's composition and responsibilities and how those responsibilities were discharged.

36.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false representations to the SEC, the investing public, and the Company's stockholders.

37.    In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth,

13

operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Nektar to make false and misleading statements of material fact about the Company's financials and about Nektar's maintenance of adequate internal controls.

38. Each of the Individual Defendants further owed to Nektar and its stockholders the duty of loyalty requiring that each favor Nektar's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## **FACTUAL ALLEGATIONS**

**Background**

39. Nektar is a research-based biopharmaceutical company focused on discovering and developing innovative medicines in areas of high unmet medical need. Nektar's research and development pipeline of new investigational drugs includes potential therapies for cancer, autoimmune disease, and chronic pain. Nektar purportedly leverages its proprietary and proven chemistry platform to discover and design new drug candidates. According to Nektar, these drug candidates utilize its advanced polymer conjugate technology platforms, which are designed to enable the development of new molecular entities that target known mechanisms of action.

40. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg. NKTR-214 is a biologic substance developed to stimulate proliferation and growth of tumor-killing immune cells in the tumor-micro-environment.

41. Bristol-Myers began taking interest in collaborating with Nektar on NKTR-214. Bristol-Myers already had Opdivo and Yervoy, cancer-fighting drugs, already on the market. Opdivo and Yervoy, however, only worked in approximately one in five patients with solid tumors. To increase success rate, Bristol-Myers began looking to combine their approved drugs with other drugs still in the development phase.

14

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

42.     Test results from a collaboration of NKTR-214 and Opdivo between 2016 and 2017 indicated that the combination could be effective in more than half of patients. According to one *Forbes* reporter, early results combining Opdivo and NKTR-214 were presented in November 2017, and "showed the drug combination shrinking skin, kidney, and lung tumors in many patients, including some who saw their tumors disappear. But there was no control group of patients randomly assigned to receive Opdivo alone, [which] ma[de] it hard to be certain that the results were really due to adding NKTR-214."

43.     On February 13, 2018, Nektar entered into a Strategic Collaboration Agreement with Bristol-Myers, to jointly develop NKTR-214. The key economic components of the collaboration transaction included Bristol-Myers making a non-refundable up-front payment of $1 billion to Nektar and an $850 million equity investment in the Company's common stock at a premium over the 20-day VWAP for each share of common stock, Bristol-Myers being responsible for a majority of the costs of the collaboration development plan, the Company's annual funding obligation for collaboration development being limited to $125 million, Nektar retaining a 65% profit interest in NKTR-214, and recording global revenue for NKTR-214 commercial sales. Together, Nektar and BMS are jointly developing NKTR-214 under an expansive joint development plan that encompasses more than 20 indications across nine tumor types.

44.     In addition to the $1.85 billion cash and stock deal, Nektar would receive a massive incentive program worth an additional $1.78 billion in milestone payments upon the completion of certain developmental, regulatory, and sales targets.

45.     Media outlets reported that the agreement was the largest single-drug collaboration in history and extremely lucrative to Nektar. For example, the *San Francisco Business Times* called the deal "record-smashing" and a "drug industry record." *Forbes* described the agreement as "a whopping sum, especially for a minority stake in [one] drug."

46.     The Individual Defendants touted the collaboration agreement in a press release issued on February 14, 2018, stating that the agreement "[e]stablishes a broad joint clinical

15

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

development plan combining NKTR-214 with [Bristol-Myers's] Opdivo and Opdivo plus Yervoy (ipilimumab) in registration-enabling trials in more than 20 indications across 9 tumors."

47.    The Individual Defendants continued to tout the collaboration agreement during a conference call held with investors and analysts on February 14, 2018.  During the call, defendant Robin emphasized that Nektar was entitled to "substantial upfront" cash of $1.85 billion and may earn "future cash payments" totaling $1.78 billion.

48.    The Individual Defendants likewise touted the collaboration agreement in a Form 10-K filed with the SEC for fiscal 2018 stating:  "We and [Bristol-Myers] are jointly developing NKTR-214 under an expansive joint development plan . . . that encompasses more than 20 indications across nine tumor types. . . . Many other registrational studies in additional tumor types and indications are planned to begin in 2019."  The Individual Defendants added in the same 10-K that "[u]nder the [collaboration agreement], we and [Bristol-Myers] will collaborate to develop and conduct clinical studies of NKTR-214  pursuant to a joint development plan, which includes a series of registration-enabling trials in nine tumor types and may be revised only upon mutual agreement of the parties."

49.    The Individual Defendants continued to tout the collaboration in its SEC filings the rest of 2018 and the first half of 2019.

50.    In January and February 2019, it was well-known within Nektar and Bristol-Myers that the NKTR-214 collaboration would need to be narrowed in scope.  Instead of pursuing 20 indications across 9 tumor types, Nektar and Bristol-Myers were only pursuing renal, prostate, and lung cancers.  The reduction of the NKTR-214 research was due to concerns with preliminary analyses, market commercialization, patient population needs, ability to get approval for the drug, and difficulties in recruiting doctors and sites.

51.    Through the PIVOT-02 clinical study, the Company evaluated the benefit, safety, and tolerability of combining NKTR-214 with Opdivo in collaboration with Bristol-Myers.  Around the same time Nektar and Bristol-Myers were narrowing the scope of NKTR-214 research, Nektar was experiencing problems in its manufacturing processes with respect to certain batches of NKTR-214 used in clinical trials.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**The Individual Defendants' Materially False and Misleading Statements and Omissions**

52.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants committed securities fraud by failing to disclose that: (1) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

53.     On February 15, 2019, the Individual Defendants caused the Company to publish a press release discussing clinical data from the PIVOT-02 Study, which stated:

> The preliminary results from patients enrolled in the 1L urothelial cancer cohort in the ongoing PIVOT-02 Phase 1/2 study were shared in a poster presentation today titled, *"NKTR-214 + nivolumab in first-line advanced/metastatic urothelial carcinoma (mUC): Updated results from PIVOT-02"* by Arlene O. Siefker-Radtke, M.D., Professor, Department of Genitourinary Medical Oncology, Division of Cancer Medicine at The University of Texas MD Anderson Cancer Center and Clinical Co-Leader of the Bladder Cancer SPORE Executive Committee.

> "Preliminary data from the ongoing PIVOT-02 trial in metastatic urothelial cancer patients demonstrated important response rates, including complete responses, in patients who were cisplatin-ineligible or refused standard of care," said Mary Tagliaferri, M.D., Chief Medical Officer of Nektar Therapeutics. "These responses were observed regardless of baseline PD-L1 expression and no relapses occurred. In this cohort of Stage IV bladder cancer patients with a median age of 70, the combination therapy was generally well tolerated with no Grade 4 or 5 adverse events reported. Of note, our translational research demonstrated that in patients with the highest unmet medical need – those whose tumors did not express PD-L1 at their baseline scan – treatment with the combination resulted in 70 percent of patients converting to PD-L1 positive expressors. These data support our development strategy in this tumor setting, including the Phase 2 PIVOT-10 study underway in cisplatin-ineligible urothelial cancer patients with low PD-L1 tumor expression."

> **Highlights from the ASCO-GU presentation in 1L metastatic urothelial carcinoma patients include:**

17

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

***Clinical Efficacy***

*Response measured per RECIST 1.1 for per protocol efficacy-evaluable patients treated at the recommended Phase 2 dose (RP2D) and with ≥1 post-treatment scan as of December 3, 2018:*

- Best overall response rate (ORR) was 48% (13/27) in efficacy-evaluable patients, with a 19% (5/27) complete response (CR) rate.

- ORR by immune-related RECIST (irRECIST) was 52% (14/27); ORR in patients with visceral non-nodal metastases was 53% (8/15).

- ORR in patients that refused standard of care was 55% (6/11); in cisplatin-ineligible patients ORR was 44% (7/16).

- Disease control rate (DCR) was 70% (defined as CR + partial response (PR) + stable disease (SD)).

- Median percent reduction in target lesions from baseline in all 27 efficacy-evaluable patients was 32%.

- Median percent reduction in target lesions from baseline in all 13 responders was 78%.

- Median time to response was 2.0 months.

- In patients with RECIST response, no patients discontinued due to relapse.

- Amongst the 23 patients with known pre-treatment programmed death-ligand 1 (PD-L1) status, ORR in PD-L1 negative patients was 45% (5/11) and in PD-L1 positive patients was 50% (6/12).

54. On February 28, 2019, the Individual Defendants caused the Company to issue a press release announcing the Company's financial and operational results for the fourth quarter of fiscal 2018. In the press release, the Individual Defendants noted that "[i]n February 2018, Nektar and Bristol-Myers [] entered into a global development and commercialization agreement to evaluate the full potential of bempegaldesleukin with nivolumab in more than 20 indications in 9 tumor types." The Individual Defendants also stated that they "continue to design and execute on [their] board registrational program for NKTR-214 (bempegaldesleukin) with our partner Bristol Myers[]."

55. On the same day, the Individual Defendants held a conference call with investors and analysts, during which defendant Robin stated:

As you know, the joint development plan with Bristol includes about 20 registrational trials across multiple tumor types. And so far, the first 10 of these trials in the joint development plan, including our accelerated approval strategy in bladder cancer, have been initiated or in the process of starting . . . . [t]he [Bristol Myers] and Nektar

18

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

teams have been working very closely together on the program, and we've made tremendous progress over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration.

56.     During the call, defendant Labrucherie added that "[a] significant amount of our R&D budget represents our portion of the investment in the broad registrational development plan for NKTR-214 that we are executing with our partner [Bristol Myers].   We have multiple registrational studies underway with many more registrational studies planned."

57.     On March 1, 2019, the Individual Defendants caused the Company to file a Form 10-K (the "2018 10-K") with the SEC announcing the Company's financial and operational results for the fourth quarter of 2018 and 2018 annually.  Under the "Risk Factors" section of the 2018 10-K, the Individual Defendants stated:

> ***We are highly dependent on the success of NKTR-214, our lead I-O candidate.  We are executing a broad development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business.***
>
> Our future success is highly dependent on our ability to successfully develop, obtain regulatory approval for, and commercialize NKTR-214.  In general, most early stage investigatory drugs, including oncology drug candidates such as NKTR-214, do not become approved drugs.  Accordingly, there is a very meaningful risk that NKTR-214 will not succeed in one or more clinical trials sufficient to support one or more regulatory approvals.  To date, reported clinical outcomes from NKTR-214 have had a significant impact on our market valuation, financial position, and business prospects and we expect this to continue in future periods.  If one or more clinical studies of NKTR-214 are delayed or not successful, it would materially harm our market valuation, prospects, financial condition and results of operations.  For example, under the BMS Collaboration Agreement, we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program.  One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated.
>
> *                  *                  *
>
> ***Our manufacturing operations and those of our contract manufacturers are subject to laws and other governmental regulatory requirements, which, if not met, would have a material adverse effect on our business, results of operations and financial condition.***
>
> We and our contract manufacturers are required in certain cases to maintain compliance with current good manufacturing practices (cGMP), including cGMP guidelines applicable to active pharmaceutical ingredients and drug products, and with laws and regulations governing manufacture and distribution of controlled substances, and are subject to inspections by the FDA, the Drug Enforcement

Administration or comparable agencies in other jurisdictions administering such requirements. We anticipate periodic regulatory inspections of our drug manufacturing facilities and the manufacturing facilities of our contract manufacturers for compliance with applicable regulatory requirements. Any failure to follow and document our or our contract manufacturers' adherence to such cGMP and other laws and governmental regulations or satisfy other manufacturing and product release regulatory requirements may disrupt our ability to meet our manufacturing obligations to our customers, lead to significant delays in the availability of products for commercial use or clinical study, result in the termination or hold on a clinical study or delay or prevent filing or approval of marketing applications for our products. Failure to comply with applicable laws and regulations may also result in sanctions being imposed on us, including fines, injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our products, delays, suspension or withdrawal of approvals, license revocation, seizures, administrative detention, or recalls of products, operating restrictions and criminal prosecutions, any of which could harm our business. Regulatory inspections could result in costly manufacturing changes or facility or capital equipment upgrades to satisfy the FDA that our manufacturing and quality control procedures are in substantial compliance with cGMP. Manufacturing delays, for us or our contract manufacturers, pending resolution of regulatory deficiencies or suspensions could have a material adverse effect on our business, results of operations and financial condition.

(Emphasis added).

58.     On May 8, 2019, the Individual Defendants issued a press release announcing the Company's financial and operational results for the first quarter of fiscal 2019. In the press release, the Individual Defendants stated that "Nektar continues to advance [its] immune-oncology and immunology pipeline with clinical trials initiating for multiple drug candidates across multiple indications. . . . We are working with our partner, Bristol-Myers [], to execute on our broad joint development program for NKTR-214 in combination with nivolumab, with registrational trials in melanoma, RCC, urothelial and non-small cell lung cancer underway and additional trials planned to begin in the coming months."

59.     On the same day, the Individual Defendants held a conference call with investors and analysts discussing Nektar's first quarter fiscal 2019 results, during which defendant Robin stated, "The joint development plan with Bristol includes many registrational trials across multiple tumor types. [Bristol Myers] and Nektar are currently working on the designs for the next wave of trials in

20

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

lung, breast, gastric, and colorectal cancers as well as sarcoma. Our 2 teams have been working very closely together on trial designs in a changing competitive landscape."

60.    On June 1, 2019, the Individual Defendants caused the Company to publish a press release discussing clinical data from the PIVOT-02 Phase 2 study, which stated:

> New baseline biomarker analyses and updated clinical study efficacy and safety results were shared in a presentation titled, "*Baseline tumor-immune signatures associated with response to bempegaldesleukin (NKTR-214) and nivolumab*" (Abstract #2623/Poster Board #267) by Michael Hurwitz, Ph.D., M.D. who serves as Assistant Professor of Medicine, Medical Oncology at Yale Cancer Center during the "Developmental Immunotherapy and Tumor Immunobiology" poster session on Saturday, June 1, 2019.
>
> "The Stage IV melanoma patients enrolled in the ongoing PIVOT-02 study continue to experience both deepening and durability of response over time," said Jonathan Zalevsky, Ph.D., Chief Scientific Officer at Nektar Therapeutics. "This translated into a 34% rate of complete response at a 12-month follow-up for the 38 efficacy-evaluable patients in this cohort. Further, 42% of patients achieved a 100% reduction in target lesions. Finally, corresponding lymphocyte data highlight the benefit of replenishing and stimulating T cells continuously over the course of treatment with an I-O doublet regimen."
>
> Bempegaldesleukin (NKTR-214, bempeg) is an investigational, CD122-preferential IL-2 pathway agonist designed to provide sustained signaling through the IL-2 beta-gamma receptor. PIVOT-02 is an ongoing Phase 2 study evaluating bempeg in combination with nivolumab in solid tumors.

61.    On August 1, 2019, the Individual Defendants caused the Company to publish a press release announcing that the U.S. Food and Drug Administration ("FDA") had granted Breakthrough Therapy Designation for the use of NKTR-214 with Opdivo for the treatment of patients with previously untreated unresectable or metastatic melanoma. The press release stated:

> Nektar Therapeutics (Nasdaq: NKTR) and Bristol-Myers Squibb (NYSE: BMY) today announced that the U.S. Food and Drug Administration (FDA) has granted Breakthrough Therapy Designation for investigational agent bempegaldesleukin (NKTR-214) in combination with Bristol-Myers Squibb's Opdivo® (nivolumab) for the treatment of patients with previously untreated unresectable or metastatic melanoma. The Breakthrough Therapy Designation is based on clinical data which were recently reported at the 2019 American Society of Clinical Oncology (ASCO) Annual Meeting from the cohort of patients with metastatic melanoma that were treated with the doublet therapy in the ongoing PIVOT-02 Phase 1/2 clinical study.
>
> FDA Breakthrough Therapy Designation is intended to expedite the development and review of medicines aimed at treating a serious or life-threatening disease

21

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

where there is preliminary clinical evidence that the investigational therapy may offer substantial improvement over existing therapies on at least one clinically significant endpoint.

62.    The above statements identified in ¶¶ 53-61 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects at the time they were made because the Individual Defendants failed to disclose that: (1) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Emerges**

63.    On August 8, 2019, after the market closed, the Company revealed that a manufacturing issue caused two batches of bempegaldesleukin to differ from the other 20 batches that were produced.  Moreover, these batches resulted in variable clinical benefit from other batches used in the Company's PIVOT-02 clinical trial.  The Company also revealed that it only had four active indications running with Bristol-Myers, and going forward, the collaboration with Bristol-Myers under the collocation agreement would focus only "on 5 or 6 key" indications, a significant narrowing of the collaboration, which had long been touted as involving 18 to 20 indications over nine tumor types.

64.    In a conference call held to discuss the Company's second quarter fiscal 2019 financial results, defendant Robin stated, in relevant part:

At the recent ASCO 2019 meeting, we reported an update from the first-line melanoma cohort in PIVOT-02 that showed an improvement in complete response rates and deepening of responses for patients who responded to the doublet therapy,

22

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

a clear benefit for these patients.  We recently announced that these compelling data led to a breakthrough designation from the FDA.

\*       \*       \*

[W]e conducted a thorough characterization of all of the 22 lots of bempeg peg produced to-date, including all of those which currently supply and we'll supply our current and future registrational studies. ***The characterization work from these new assays revealed that two of the earliest production batches of bempeg were different than the other 20 batches produced.***  These two early manufacturing lots are known as lots two and five and the time of their production bidding beginning in 2016 it was early on in the manufacturing campaign and these lots were within the manufacturing controls and release specifications.  As such, we did not detect any meaningful variability upon their release.  Various early production batches of bempeg were sequentially distributed in PIVOT-02, lots one, two, three and five.  As more clinical data matured and became available in PIVOT-02 and once we had identified the outlier variances of lots two and five, we then had the basis to start analyzing any potential differences between data from patients that started treatment with lots one and three as compared to lots two and five. ***We found notable correlations in several cohorts with evidence of an improved clinical benefit and patients who started treatment with lots one and three as compared to patients who started treatment with lots two and five.***

\*       \*       \*

Let's just say this, if we get—if we—and I believe we will, have 6 major registrational trials running in 6 different indications with [Bristol-Myers], I do believe that's a good way to develop and focus development of bempeg.  And I would expect that that's where we wind up. Clearly, at this point, running 20 trials is probably not the right thing to do in terms of how we use our resources. But I think if we identify, and I know we will, 5 or 6 very relevant, very significant registrational trials, I would expect that we can bring NKTR-214 and nivo to a very, very good result.

(Emphasis added).

65.     Defendant Robin added that the Company had "identified the cause of the physical differences between these lots, which we now know stemmed from a single sub-optimal batch of in-process intermediate that was used to produce only these 2 lots, lots 2 and 5 of the 22 lots we've made to date.  The issue was restricted only to the single batch of intermediate used in lots 2 and 5[.]"

66.     The Company also revealed that it had withdrawn a presentation at the 2019 ESMO meeting with respect to first-line non-small cell lung cancer results, which it had promised on May 8, 2019 would be delivered at that meeting.  The Company described that it was enrolling additional patients in the first-line non-small cell lung cancer cohorts, and "those patients are starting treatment

23

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

with NKTR-214 lots that are not lots 2 and 5," suggesting that the study had been delayed while the manufacturing issue was resolved. Defendant Robin acknowledged that delays in Nektar's clinical collaboration with Bristol-Myers, which would include the delayed small lung cell results, was the result of manufacturing issue by stating: "we had to delay here because of these manufacturing lots that we recently correlated with clinical data."

67. On this news, the Company's share price fell $8.65, or nearly 30%, to close at $20.92 per share on August 9, 2019, on unusually heavy trading volume.

**The Director Defendants Issued a Materially False
and Misleading Proxy Statement During the Relevant Period**

68. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period. The Director Defendants drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to Nektar's stockholders on April 30, 2019 (the "2019 Proxy"). The Director Defendants negligently issued materially misleading statements in the 2019 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege nor sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

69. The 2019 Proxy sought stockholder votes to, among others, elect defendants Greer and Lingnau for a three-year term.

70. In support the Director Defendants' bid to reelect defendants Greer and Lingnau, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Nektar faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2019 Proxy stated:

24

The board of directors monitors and assesses key business risks directly through deliberations of the board of directors and also by way of delegation of certain risk oversight functions to be performed by committees of the board of directors. The board of directors regularly reviews and assesses, among other matters, the following important areas that present both opportunities and risk to the Company's business:

- Review and approval of the Company's annual operating and capital spending plan and review of management's updates as to the progress against the plan and any related risks and uncertainties.

- Periodic consideration of the balance of risk and opportunities presented by the Company's medium to long-term strategic plan and the potential implications of success and failure in one or more of the Company's key drug development programs.

- Regular consideration of the risks and uncertainties presented by alternative clinical development strategies.

- Periodic review and oversight of information technology (IT) risks and opportunities.

- Regular review of the progress and results of the Company's clinical development programs and early research efforts including but not limited to the strengths, weaknesses, opportunities and threats for these programs.

- Periodic review and oversight of material outstanding litigation or threatened litigation.

- Review and approval of material collaboration partnerships for the further development and commercial exploitation of the Company's proprietary drug development programs and technologies.

- Regular review and approval of the annual corporate goals and an assessment of the Company's level of achievement against these established goals.

- Regular review of the Company's financial position relative to the risk and opportunities for the Company's business.

- Periodic review of the Company's intellectual property estate.

- Periodic review and assessment of CEO succession planning.

- Periodic review of the Company's compensation programs.

The discussion above of risk oversight matters reviewed by the board of directors is intended to be illustrative only and not a complete list of all important matters reviewed and considered by the board of directors in providing oversight and direction for the Company's senior management and business.

The risk oversight function of the board of directors is also administered through various board committees. The Audit Committee oversees the management of financial, accounting, internal controls, disclosure controls and the engagement

25

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

arrangement and regular oversight of the independent auditors. The Audit Committee also periodically reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions. To assist the Audit Committee in its risk management oversight function, the internal auditor has a direct reporting relationship to the Audit Committee. The Company's internal audit function is focused on internal control monitoring and activities in support of the Audit Committee's risk oversight function.

*     *     *

### AUDIT COMMITTEE

The Audit Committee of the board of directors oversees our corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The Audit Committee:

- evaluates the performance of and assesses the qualifications of our independent registered public accounting firm;

- determines whether to retain or terminate our independent registered public accounting firm or to appoint and engage a new independent registered public accounting firm;

- reviews and determines the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation, and negotiates and executes, on behalf of the Company, engagement letters with the independent auditors;

- establishes guidelines and procedures with respect to the rotation of the lead or coordinating audit partners having primary responsibility for the audit and the audit partner responsible for reviewing the audit;

- reviews and approves the retention of the independent registered public accounting firm for any permissible non-audit services and, at least annually, discusses with our independent registered public accounting firm, and reviews, that firm's independence;

- obtains and reviews, at least annually, a formal written statement prepared by the independent registered public accounting firm delineating all relationships between the independent registered public accounting firm and the Company and discusses with the independent registered public accounting firm, and reviews, its independence from management and the Company;

- reviews with the independent registered public accounting firm any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent registered public accounting firm and management's response;

- reviews with management and the independent registered public accounting firm the scope, adequacy and effectiveness of our financial reporting controls;

26

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- reviews and discusses with management, the Company's risk management committee, the internal auditor and the independent registered public accounting firm, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks;

- reviews and evaluates the Company's information technology processes and risks;

- establishes and maintains procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- investigates and resolves any disagreements between our management and the independent registered public accounting firm regarding our financial reporting, accounting practices or accounting policies and reviews with the independent registered public accounting firm any other problems or difficulties it may have encountered during the course of the audit work;

- meets with senior management and the independent registered public accounting firm in separate executive sessions;

- reviews the consolidated financial statements to be included in our quarterly reports on Form 10-Q and our annual reports on Form 10-K;

- discusses with management and the independent registered public accounting firm the results of the independent registered public accounting firm's review of our quarterly consolidated financial statements and the results of our annual audit and the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our periodic reports;

- reviews and discusses with management and the independent registered public accounting firm any material financial arrangements of the Company which do not appear on the financial statements of the Company and any significant transactions or courses of dealing with parties related to the Company;

- reviews with management and the independent registered public accounting firm significant issues that arise regarding accounting principles and financial statement presentation;

- oversees the Company's internal audit function;

- discusses with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's consolidated financial statements, financial reporting process or accounting policies;

- oversees the preparation of the Audit Committee report to be included in the Company's annual report or proxy statement; and

27

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

With the passing away of Mr. Krivulka on February 17, 2018 and the retirement of Mr. Winger effective as of September 26, 2018, the current members of the committee are Messrs. Ajer, Greer and Whitfield and Ms. Eastham, who was appointed to the committee effective as of September 26, 2018. Mr. Greer serves as the Chairman of the Audit Committee. The board of directors annually reviews the NASDAQ listing standards definition of independence for Audit Committee members and has determined that all members of our Audit Committee are independent.

During the 2018 fiscal year, the board of directors determined that Mr. Greer qualified as an "Audit Committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Greer's level of knowledge and experience based on a number of factors, including his formal education and experience as a Chief Executive Officer at a public reporting company, a Chief Financial Officer, and the chairman of public company Audit Committees. In addition to our Audit Committee, Mr. Greer also serves as the chair of the Audit Committee of Inogen, Inc. (NASDAQ: INGN). The board of directors does not believe that such simultaneous service impairs Mr. Greer's ability to effectively serve as Chairman of our Audit Committee. The board of directors has also determined that Ms. Eastham also qualifies as an "Audit Committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Ms. Eastham's level of knowledge and experience based on a number of factors, including her formal education and experience as a Chief Financial Officer of a public reporting company. In addition to our Audit Committee, Ms. Eastham also serves on the Audit Committees of Illumina, Inc. (NASDAQ: ILMN), Geron Corporation (NASDAQ: GERN) and Veracyte, Inc. (NASDAQ: VCYT). The board of directors does not believe that such simultaneous service impairs Ms. Eastham's ability to effectively serve on our Audit Committee. The Audit Committee has adopted a written Audit Committee charter that is available on our corporate website at *www.nektar.com*.

\*       \*       \*

**CODE OF BUSINESS CONDUCT AND ETHICS**

We have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. The code of business conduct and ethics is available on our website at www.nektar.com. Amendments to, and waivers from, the code of business conduct and ethics that apply to any director, executive officer or persons performing similar functions will be disclosed at the website address provided above and, to the extent required by applicable regulations, on a Current Report on Form 8-K filed with the SEC.

\*       \*       \*

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The Audit Committee is currently comprised of four non-employee directors, R. Scott Greer, the Chairman of the committee, Jeff Ajer, Karin Eastham and Roy A. Whitfield.  Joseph J. Krivulka had been a member of the Audit Committee until his passing on February 17, 2018.  Dennis L. Winger had been a member of the Audit Committee until his retirement on September 26, 2018.  Our board of directors determined that Messrs. Greer, Ajer and Whitfield and Ms. Eastham meet the independence requirements set forth in Rule 10A-3(b)(1) under the Exchange Act and in the applicable NASDAQ rules.  In addition, the board of directors determined that Messrs. Krivulka and Winger qualified, and Mr. Greer and Ms. Eastham qualify, as Audit Committee financial experts as defined by SEC rules.  The Audit Committee has the responsibility and authority described in the Nektar Therapeutics Audit Committee Charter, which has been approved by the board of directors.  A copy of the Audit Committee Charter is available on our website at www.nektar.com.

The Audit Committee is responsible for assessing the information provided by management and our independent registered public accounting firm in accordance with its business judgment.  Management is responsible for the preparation, presentation and integrity of our financial statements and for the appropriateness of the accounting principles and reporting policies that are used.  Management is also responsible for testing the system of internal controls and reports to the Audit Committee on any deficiencies found.  Our independent registered public accounting firm, Ernst & Young LLP, is responsible for auditing the annual financial statements and for reviewing the unaudited interim financial statements.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed the audited financial statements in the annual report on Form 10-K for the year ended December 31, 2018 with both management and our independent registered public accounting firm.  The Audit Committee's review included a discussion of the quality and integrity of the accounting principles, the reasonableness of significant estimates and judgments and the clarity of disclosures in the financial statements.

The Audit Committee reviewed with our independent registered public accounting firm the overall scope and plan of the audit.  In addition, it met with our independent registered public accounting firm, with and without management present, to discuss the results of our independent registered public accounting firm's examination, the evaluation of our system of internal controls, the overall quality of our financial reporting and such other matters as are required to be discussed under generally accepted accounting standards in the United States.  The Audit Committee has also received from, and discussed with, our independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, "*Communications with Audit Committees*" issued by the Public Company Accounting Oversight Board ("PCAOB").

The Audit Committee has discussed with Ernst & Young LLP that firm's independence from management and our Company, including the matters in the written disclosures and the letter regarding independence from Ernst & Young LLP required by applicable requirements of the PCAOB.  The Audit Committee has also considered the compatibility of audit related and tax services with the auditors' independence.  Based on its evaluation, the Audit Committee has selected Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2019.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

> In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the board of directors, and the board of directors approved, the inclusion of the audited financial statements and management's assessment of the effectiveness of our internal controls over financial reporting in the annual report on Form 10-K for the year ended December 31, 2018 filed with the SEC.

71. The 2019 Proxy thus assured stockholders that both the Individual Defendants and the Board were involved with Nektar's business strategy and actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose that: (1) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

72. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Greer and Lingnau.

**The Insider Selling Defendants Sold Substantial Shares of Nektar Stock While**
**in Possession of Material, Adverse, Information Regarding the Company's Business**

73. During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Nektar common stock while in possession of material information that was adverse to Nektar's business.

74. In particular, the Insider Selling Defendants sold a total of more than $13.7 million in Nektar common stock during the Relevant Period.

75. In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## DAMAGES TO THE COMPANY

76.     As a result of the Individual Defendants' wrongful conduct, Nektar disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Nektar's credibility.  Nektar has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

77.     Moreover, the Individual Defendants' actions in directing Nektar to undertake illicit sales practices have exposed Nektar to civil and criminal liability and are not protected by the business judgment rule.

78.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action in addition to potential fines from U.S. regulators regarding the Company's illicit sales practices.

79.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Nektar's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

80.     Moreover, these actions have irreparably damaged Nektar's corporate image and goodwill.  For at least the foreseeable future, Nektar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Nektar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND ALLEGATIONS

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

31

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

83.     Plaintiff is an owner of Nektar common stock and was an owner of Nektar common stock at all times relevant hereto.  As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

84.     At the time this action was commenced, Nektar's Board consisted of the Director Defendants.   These directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action, and therefore demand is futile, for the following reasons:

A.     The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The current members of the Board were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate;

B.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard allowed Nektar to partake in illicit sales practices and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices;

C.     The Director Defendants knowingly and/or recklessly authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Nektar to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants;

D.     As noted above, the Insider Selling Defendants personally benefited from Nektar's materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of Nektar stock at artificially inflated prices, a benefit not shared by Nektar's public stockholders.  Accordingly, demand is futile as to the Robin and Lingnau;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

E.    Defendant Robin is not disinterested for purposes of demand futility because his principal occupation is serving as Nektar's CEO. As such, the 2019 Proxy filed with the SEC explicitly states that Wilkinson is not independent. Further, according to the Company's SEC filings, in 2018, Wilkinson received total compensation of $13,330,667. This amount is material to him;

F.    As members of the Audit Committee during the Relevant Period, defendants Greer, Ajer, Eastham, and Whitfield participated in and knowingly approved Nektar's illicit sales practices and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Anderson, McFarland, and Greer were obligated to oversee and monitor the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements. Instead, defendants Anderson, McFarland, and Greer, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Greer, Ajer, Eastham, and Whitfield; and

G.    Demand is excused as to defendants Greer, Robin, and Lingnau because of their overlapping business affiliations. Due to their close relationships, and conflicts of interests arising therefrom, defendants Greer, Robin, and Lingnau, cannot take the necessary and proper steps to investigate and remedy the Individual Defendants' wrongdoing. Defendants Greer, Robin, and Lingnau are incapable of independently and impartially consider a demand to commence and vigorously prosecute this action.

a.    Defendants Greer, Lingnau, and Robin served on the board of Sirna Therapeutics, Inc. at the same time. Defendant Greer served as a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from 2003, and as its chairman of the board of directors from 2005 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

b.    Defendant Lingnau was a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from February 2006 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

c.    Robin served as CEO Officer, President and a director of Sirna Therapeutics, Inc., a biotechnology company, from July 2001 to November 2006 and from January 2001 to June 2001, served as their Chief Operating Officer, President and as a director.

d.    In addition, defendants Lingnau and Robin were colleagues at Schering, AG and Berlex Laboratories, Inc. Defendant Lingnau retired from Schering AG Group, Germany, in December 2005 as a member of Schering AG's Executive Board and as Vice Chairman, President and Chief Executive Officer of Schering Berlin, Inc., a United States subsidiary. Prior to his retirement, Mr. Lingnau was responsible for Schering AG's worldwide specialized therapeutics and dermatology businesses. He joined Schering AG's business trainee program in 1966. Throughout his career at Schering AG, defendant Lingnau served in various capacities and in a number of subsidiaries

33

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

in South America and the United States, including his roles as President of Berlex Laboratories, Inc., from 1983 to 1985, as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering AG, from 1985 to 1989, and as chairman of Berlex Laboratories, Inc. from 1985 to 2005.

e.   Defendant Robin was Corporate Vice President and General Manager at Berlex Laboratories, Inc., a pharmaceutical products company that is a subsidiary of Schering, AG from 1991 to 2001. From 1987 to 1991 he served as Vice President of Finance and Business Development and Chief Financial Officer. From 1984 to 1987, Mr. Robin was Director of Business Planning and Development at Berlex.

f.   Due to their long-standing professional and personal ties with each other defendants Greer, Lingnau, and Robin are incapable of impartially considering a demand to commence and vigorously prosecute this action, and, thus, the demand upon them is excused.

## COUNT I
### Against the Individual Defendants
### for Breach of Fiduciary Duty

85.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

86.   Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nektar's business and affairs.

87.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

88.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nektar.

89.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

90.   The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the illicit sales practices in violation of U.S. law.

91.   In addition, the Individual Defendants further breached their fiduciary duties owed to Nektar by failing to disclose that: (1) Nektar and Bristol-Myers had decided to reduce the number

of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

92.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

93.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

94.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nektar has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

96.     Plaintiff on behalf of Nektar has no adequate remedy at law.

**COUNT II**
**Against the Director Defendants for Violation of**
**Section 14(a) of the Exchange Act**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

98.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims detailed herein do not allege nor sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

99.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

100.    The 2019 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Nektar misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect defendants Greer and Lingnau.

101.    Plaintiff, on behalf of Nektar, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the defendants Greer and Lingnau.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## COUNT III
### Against the Insider Selling Defendants for
### Insider Selling and Misappropriation of Information

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    At the time each of the Insider Selling Defendants sold his or her Nektar stock, he or she knew the material, non-public information described above, and sold Nektar stock on the basis of such information.

104.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Nektar stock.  Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Nektar stock.

105.    The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Nektar for insider trading.

106.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

107.    Plaintiff, on behalf of Nektar, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Nektar and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

37

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

C.    Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of Nektar stock while in possession of insider information as described herein;

D.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  February 20, 2020                    Respectfully submitted,

                                             **BRAGAR EAGEL & SQUIRE, P.C.**

                                             */s/ Melissa A. Fortunato*
                                             Melissa A. Fortunato (#319767)
                                             101 California Street, Suite 2710
                                             San Francisco, California 94111
                                             Telephone: (415) 365-7149
                                             Email: fortunato@bespc.com

                                             *Attorneys for Plaintiff*

**OF COUNSEL:**

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Email: mhynes@hh-lawfirm.com
        lhernandez@hh-lawfirm.com

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Gail Becker, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE:    2/18/2020

DocuSigned by:

*Ms. Gail Becker*

54AF3DBF0C834E5...

Gail Becker